Charlotte E. FRITZ, and Russell C. Fritz,
Plaintiffs-Appellants,

v.

Robert E. McGRATH, D.D.S., and Mid-Towne
Dental Associates, S.C., Defendants-
Respondents.†

Court of Appeals

*No. 87–2112. Submitted on briefs August 2, 1988.—Decided
September 29, 1988.*

(Also reported in 431 N.W.2d 751.)

† Petition to review denied.

For the plaintiffs-appellants the cause was submitted on the briefs of *Maris Rushevics* and *Anderson, Shannon, O'Brien, Rice & Bertz,* of Stevens Point.

For the defendants-respondents the cause was submitted on the brief of *Elizabeth V. Pavlick* and *Sager & Pavlick, S.C.,* of Fond du Lac.

Before Dykman, Eich and Sundby, JJ.

EICH, J. Charlotte Fritz[1] appeals from a summary judgment dismissing her dental malpractice action against Robert E. McGrath. The issues are: (1) whether there are disputed issues of material fact which would preclude summary judgment as a remedy; and (2) if not, whether the trial court erred when it

[1]Charlotte Fritz's husband, Russell, is also a party to the action. We use the collective "Fritz" for simplicity.

concluded that Fritz's injury had been "discovered" more than three years before the action was commenced, thus barring the suit under the applicable statutes of limitation, secs. 893.04 and 893.54(1), Stats. Fritz does not seriously press the first issue, and we are satisfied that there is no issue of disputed fact material to the dispositive issue in the case. We are also satisfied that, as a matter of law, Fritz must be held to have discovered her injury more than three years prior to commencement of the action. We therefore affirm the judgment.

In summary judgment cases, we follow well-known and well-documented procedures. *In re Cherokee Park Plat,* 113 Wis. 2d 112, 115–16, 334 N.W.2d 580, 582–83 (Ct. App. 1983). We look first to the complaint to determine whether it states a cause of action and, if so, we consider whether the answer states a defense. If it does, we examine the moving party's affidavits to see if the evidentiary facts alleged state a *prima facie* claim for relief. If they do, we turn to the affidavits in opposition to the motion to see whether they raise material factual issues. If they do not, the case is proper for disposition of the legal issues raised in the motion. It is only where all questions relating to the pleadings and proofs are answered in the affirmative, and when we are satisfied that no material facts are in dispute, that we proceed to decide the legal questions.

In this case, Fritz's complaint states a cause of action against McGrath for dental malpractice, and McGrath's answer joins the issue. In support of his motion, McGrath submitted the affidavit of his attorney setting forth Fritz's responses to requests for

admission. In those responses, Fritz conceded the following facts.

McGrath performed periodontal surgery on Fritz on March 17, 1982. On January 20, 1983, she saw Dr. Michael Kotkins, a psychologist, and complained of a "personality change," headaches, crying spells, restlessness, difficulty in eating, and a variety of other symptoms. She stated that these symptoms began after her dental surgery, and, when asked to give a history of her problem, she stated that "[a] nerve was severed at the time of [the dental] surgery," and that the surgery "result[ed] in severe complications" and continuing pain.

On April 5, 1983, Fritz saw Dr. Y.H. Gabriel, a neurosurgeon, about her problems. She again described her symptoms as beginning immediately after the McGrath dental surgery, and she complained of tingling and pain in the area of the surgery, the upper right side of her mouth, as well as pain and increased discomfort when eating and chewing. Dr. Gabriel's "impression" was that Fritz was suffering from "[c]hronic pain syndrome with dysesthesias and pain in the right side of the face related to dental surgery." Gabriel's notes outline proposed treatment alternatives and state that "[a]ll these factors were discussed with the patient . . . ." McGrath also asserts that a note entered by Dr. Kotkins during a visit with Fritz on the following day confirms that Gabriel advised Fritz of his "impression," but the record contains only an illegible photocopy of Kotkins's note.

Fritz submitted an affidavit in opposition to the motion in which she states that "[a]t no time . . . was [she] advised by any dentist or doctor that negligence may have been involved with respect to the manner in which Dr. McGrath performed the periodontal sur-

gery in question," and that Dr. Gabriel, while telling her "there may be a 'possibility' that [she] sustained nerve damage during the periodontal surgery ..., did *not* relate all of [her] problems to the ... surgery, or relate in any manner that it was his opinion that there had been malpractice on the part of Dr. McGrath." (Emphasis in original.) She also attached a copy of a December 28, 1983, letter from another physician she had consulted indicating a "dismissal diagnosis" of, among other things, "right facial pain syndrome, indeterminate basis."

In June, 1984, Fritz contacted an attorney to inquire about the possibility of a negligence action against McGrath. The attorney secured her medical records and consulted an "expert," who gave an opinion that there was a basis for a malpractice claim against McGrath. Fritz filed the action on July 17, 1986. McGrath moved for summary judgment on grounds that the action was barred by secs. 893.04 and 893.54(1), Stats. The latter statute provides that actions for personal injuries must be commenced within three years or be barred, and the former states that the "period of limitation ... is computed from the time that the cause of action accrues until the action is commenced." The trial court concluded that the cause of action accrued, and the statute of limitations began running, as of April 5, 1983, when Dr. Gabriel "confirm[ed] ... that the pain [was] related to the [McGrath] surgery ...."

McGrath's affidavit and the attached admissions state a *prima facie* defense to the action. Fritz argues, however, that her affidavit raises disputed issues of material fact. She does not elaborate, but states only that "[t]he disputed issue ... involves the determina-

tion of when [she] first received competent medical advice as to the nature of her injury, the cause of her injury, and the respondent's part in that cause." Generally, we do not consider arguments broadly stated but never specifically argued. *State v. Beno,* 99 Wis. 2d 77, 91, 298 N.W.2d 405, 413 (Ct. App. 1980). In addition, McGrath points out that Fritz never argued to the trial court that the motion should fail because of the existence of disputed material facts. Here, too, such issues are generally not considered for the first time on appeal. *Binder v. Madison,* 72 Wis. 2d 613, 620, 241 N.W.2d 613, 617 (1976). Given the abbreviated nature of the argument, we see no reason to depart from that rule in this case.

■ The trial court's ruling was based on its interpretation of Wisconsin cases defining when a cause of action for personal injuries "accrues" within the meaning of sec. 893.04, Stats. We, of course, are not bound by the trial court's legal conclusions. We examine the issues *de novo. Muggli Dental Studio v. Taylor,* 142 Wis. 2d 696, 699, 419 N.W.2d 322, 323 (Ct. App. 1987). We are satisfied, however, that the trial court correctly decided the case.

In *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 560, 335 N.W.2d 578, 583 (1983), the Wisconsin Supreme Court adopted the "discovery rule" for determining when causes of action in tort accrue: "[T]ort claims shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first."

The general rule was amplified a few years later in *Borello v. U.S. Oil Co.,* 130 Wis. 2d 397, 411, 388 N.W.2d 140, 146 (1986), the case principally relied upon by Fritz: "[U]nder Wisconsin law, a cause of

action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by the defendant's conduct . . . ."

In *Borello,* the plaintiff purchased a new furnace for her home in December, 1977, and within a few weeks began complaining of a bad odor from the unit. She wrote to the manufacturer stating that the problems she had been experiencing with her previous furnace—problems which are not discussed in the opinion—had been aggravated, not alleviated, by the new unit, and that she was suffering from dizziness, a burning sensation in her nose, headaches and chest pain. *Id.,* 130 Wis. 2d at 400, 388 N.W.2d at 141. She sought medical assistance, telling the physicians that she believed her ailments were caused by the furnace. *Id.* at 401, 388 N.W.2d at 141. Each physician, however, "discounted the furnace as a factor in her complaints" and told her that her problems were caused by other medical conditions. *Id.* The physicians "specifically told her that her complaints could not, with any degree of probability, be attributed to the furnace." *Id.* Then, in October, 1979, another doctor, after extensive testing, concluded that her disability was caused by the defective furnace. She commenced the action against the furnace manufacturer in November, 1981.

The supreme court held that the date of the plaintiff's "discovery" of the cause of action, and thus its accrual date, was the October, 1979, diagnosis. *Borello,* 130 Wis. 2d at 405, 388 N.W.2d at 143. The court stated that the plaintiff's own subjective lay belief that the furnace was the source of her problems should not be held to start the statute running "when

the cause and effect relationship is not readily apparent, as it would be in the typical tort claim, *e.g.,* an automobile accident ...." *Id.* at 412, 388 N.W.2d at 146. After discussing the uniform medical advice that the plaintiff's symptoms were unrelated to the furnace, the court concluded that the statute of limitations did not commence to run against her claim "until she had a basis for objectively concluding" that the defective furnace "was probably the cause of her symptoms." *Id.* at 414–15, 388 N.W.2d at 147. In light of the facts of the case, the court held that the plaintiff did not have a basis for such a conclusion until the October, 1979, diagnosis. *Id.* at 415, 388 N.W.2d at 147.

We acknowledge the rule of *Borello* that a plaintiff's subjective, unconfirmed "hunch" or belief, without more, does not constitute "discovery" of the injury within the rules just discussed, and that there must be "information available ... of the nature of [the] injury, the cause of [the] injury, and the defendant's part in that cause." *Borello,* 130 Wis. 2d at 414, 388 N.W.2d at 147. But we believe that, in terms of its result, *Borello* is factually distinguishable and does not compel reversal, as Fritz argues.

Fritz's discovery admissions establish that there was much more here than just her own suspicion or belief as to the role McGrath may have played in causing her problems. From the very beginning, she was satisfied that the dental surgery was the sole cause of her oral and facial problems. Beyond that, she acknowledged that Dr. Gabriel's notes indicate that his "impression" after her first visit was that her symptoms were related to the McGrath surgery. Those notes also indicate that Gabriel discussed "[a]ll these factors ... with [Fritz] very freely."

Fritz's counteraffidavit is largely nonevidentiary. It contains considerable hearsay discussion regarding other doctors' statements to her,[2] and because the affidavits must contain *evidentiary* facts, sec. 802.08(3), Stats., hearsay evidence is not properly before the court on the motion for summary judgment. *Ranous v. Hughes,* 30 Wis. 2d 452, 461–62, 141 N.W.2d 251, 255 (1966). Much of the rest of her affidavit is conclusory,[3] and thus similarly inadmissible as a factual predicate for her defense to the motion. *Hopper v. Madison,* 79 Wis. 2d 120, 130, 256 N.W.2d 139, 143 (1977). With respect to the key question of what Dr. Gabriel told her in April, 1983, she states only that, while Gabriel advised her that there was a

[2]Fritz's affidavit is replete with nonevidentiary hearsay statements. Examples include: "Dr. Reeves ... stated that he could *not* come up with a definitive diagnosis ..." (emphasis in original); "Dr. Campbell[] also could not give me an opinion ..."; "[t]he diagnosis ... following my examinations at the Mayo Clinic was ..."; "I received many and various other diagnoses of my condition ... that my problems were psychological in origin ..."; "I was informed [by my attorney] that he consulted with an expert and he informed me that based upon the expert's opinion ..."; "I was informed as late as December, 1983, that there was no dental explanation or reason for my problems."

[3]The affidavit contains many nonevidentiary conclusory statements, such as: "The allegation that I ... should have discovered my injury ... is untrue"; "Since ... I ... had great trust and confidence in the doctors [at] the Mayo Clinic due to its nationwide reputation ... I was left only with my ... opinion that the periodontal surgery ... was the cause of my problems"; "my lay opinion ... was in no manner supported by any of the physicians and dentists by whom I was examined at the Mayo Clinic"; "Prior to[,] on or about October 1, 1984, I had not received any objective support for my subjective lay opinion that Dr. McGrath was responsible for my problems, and that I had a right of action therefor."

"possibility" that she sustained nerve damage during the McGrath surgery, he did not state "that it was his opinion that there had been malpractice on the part of Dr. McGrath." Thus, there is no factual dispute that Gabriel advised Fritz of the possibility that her problems were caused by the dental surgery.

We do not believe, as Fritz's argument suggests, that a party must be specifically advised by an expert that, in the expert's opinion, he or she received negligent treatment from a physician before the injury may be considered to have been "discovered." All that is required is that the plaintiff knew or should have known that the injury existed and that it may have been caused by the defendant's conduct. *Borello,* 130 Wis. 2d at 410, 388 N.W.2d at 145. And while there must be more than an unsubstantiated lay belief of the existence and cause of the injury on the plaintiff's part, there is no requirement that he or she must have a full and specific "magic word" medical or legal opinion before the statute will be deemed to start running.

Second, *Borello* is, as we have said, distinguishable. In that case the plaintiff, in the court's words, had been "repeatedly told by physicians that her symptoms and disabilities *could not be the result* of the [defective] furnace." *Id.,* 130 Wis. 2d at 403, 388 N.W.2d at 142 (emphasis added). Indeed, the court noted that, "at every turn, [the plaintiff] was told by professionals, who were assumed to be competent to diagnose her ailment and its cause, that the furnace fume problem was irrelevant." *Id.* at 403–04, 388 N.W.2d at 142. Fritz, on the other hand, was told by the very first physician she visited either that her ailments were "related to [the] dental surgery," or, in

her version, that it was "possible" that the surgery was a cause of her present problem.

■

Nor is this a case, again like *Borello,* where "the cause and effect relationship is not readily apparent ...." *Id.,* 130 Wis. 2d at 412, 388 N.W.2d at 146. Fritz's injury was neither obscure nor latent, as were the injuries in the cases found to be persuasive by the *Borello* court in its discussion.[4] Indeed, three physicians told the plaintiff in *Borello* that the furnace was definitely *not* a cause of her problems. It was only much later that a doctor was able to diagnose that she was suffering from "metal fume fever" and, through analysis of fume residues, to trace the origins of the disease to fumes from the faulty furnace. Fritz, on the other hand, was asymptomatic immediately prior to the McGrath surgery and symptomatic immediately thereafter; and while it is true that it was her own subjective belief that the dental surgery was the cause of her problems, she held that belief from the very beginning and she herself was certain of the causal connection. It was not just "a mere inkling or hunch" as in *Borello. Id.* at 420, 388 N.W.2d at 150. The cause and effect relationship was much more "readily ap-

---

[4]*See, e.g., Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 335 N.W.2d 578 (1983) (IUD produced no symptoms until four years after placement in plaintiff's body); *Williams v. Borden, Inc.,* 637 F.2d 731 (10th Cir. 1980) (there was "no medical evidence" that use of a chemical substance at work was a cause of plaintiff's symptoms until after the running of the statute); *Stoleson v. United States,* 629 F.2d 1265 (7th Cir. 1980) (the medical relationship between the chemicals plaintiff was using in her workplace was neither "known, nor ... knowable" at the time her symptoms arose).

parent" to Fritz than was the plaintiff's injury in *Borello.*

On these facts, we believe that Fritz received information from Dr. Gabriel which, together with other facts known to her, provided "a basis for objectively concluding" that the McGrath surgery "was probably the cause of her symptoms." *Borello,* 130 Wis. 2d at 414–15, 388 N.W.2d at 147. And because she received that information on April 5, 1983, we conclude that the trial court correctly ruled that date to be the starting point for the running of the statute of limitations.

*By the Court.*—Judgment affirmed.